942 So.2d 421 (2006)
FLORIDA SUNRISE, LTD., Appellant,
v.
TRI-M INVESTMENTS OF SOUTH FLORIDA, INC.; Ted Baturin; Traci Baturin; Lawrence Maestri; and Maestri-Murrell, Inc., a Louisiana corporation, Appellees.
Nos. 4D05-1638, 4D05-2409.
District Court of Appeal of Florida, Fourth District.
October 18, 2006.
*422 Diane H. Tutt of Diane H. Tutt, P.A., Davie (substituted after filing brief), Steven N. Lippman of Rothstein Rosenfeldt Adler, Fort Lauderdale, and Bradley Winston of Winston & Clark, P.A., Plantation, for appellant.
Bard D. Rockenbach of Burlington & Rockenbach, P.A., and Philip L. Valente of Silber, Valente & Davis, West Palm Beach, for Appellees-Tri-M Investments of South Florida, Inc., Ted Baturin and Traci Baturin.
STONE, J.
Florida Sunrise, the landlord, appeals a final judgment entered in favor of its former tenant on a counterclaim. We reverse, in part, solely as to the damage award.
Florida Sunrise entered into a lease with TRI-M Investments of South Florida, Inc. (TRI-MSF) in 1995, wherein TRI-MSF rented approximately 7,113 square feet in the Florida Sunrise Tower. The lease was for five years with two five-year renewal options. TRI-MSF used the space to operate an "executive suite" business.
In 1999, Florida Sunrise advised TRI-MSF that the leased space actually contained 9,046 square feet; this dispute ultimately led to TRI-MSF vacating the premises. After TRI-MSF left the premises, Florida Sunrise formed a corporation to run the executive suite business and offered new leases to sub-tenants who wanted to remain.
Florida Sunrise filed a multi-count complaint against TRI-MSF. TRI-MSF filed a counterclaim for breach of lease, breach of implied covenant of good faith and fair dealing, wrongful eviction, tortious interference with business relationships, conversion, and unjust enrichment.
The jury returned a verdict, finding in favor of TRI-MSF on its counterclaim in the amount of $735,000. The verdict form did not delineate the award as to each cause of action.
At trial, TRI-MSF presented testimony from Maestri, the former building manager[1] who is also the former owner of the executive suite business in question, on its claim for conversion damages. Maestri testified that the value of the phone system he had purchased was between $40,000 and $50,000, and the value of the computers, desks, furniture, signage, etc. was between $70,000 and $75,000. In addition, TRI-MSF sought conversion damages for Florida Sunrise taking over its existing subleases.
TRI-MSF also sought damages in the form of lost profits with regard to the remaining causes of action. The lost profits determination was based upon an average of TRI-MSF's income from 1997 to 1999; this average was then multiplied by ten years, the renewable years remaining on the lease, to ascertain the entire *423 amount. TRI-MSF's tax returns were entered into evidence.
In addition, Ted Baturin, one of the owners of TRI-MSF, testified as to his calculation of the lost profits of the business. Baturin contended the depreciation claimed should be added back into the net profit calculation because it was not a cash expense of the business. Baturin, as the manager of the business, was not paid a salary. However, he valued his services as an officer of the corporation at $10,000 per year, based on the fact that he averaged twenty-five hours a week running the business.
Patella, a forensic accountant, testified on behalf of Florida Sunrise regarding lost profits. Patella disagreed with Baturin's calculation, urging that depreciation represented an expense of the business, and, therefore, Baturin should not have added the depreciation amounts back into net profits. Patella also asserted Baturin's figure of $10,000 per year for officer compensation was incorrect because the median salary of a full time property manager is $38,441. Patella acknowledged that the tax returns, which included a deduction for depreciation, showed a net profit of $16,880 in 1997, $63,603[2] in 1998, and $31,466 in 1999, which averaged $37,316 for the three-year period. The tax returns did not include an amount for officer compensation.
Another element of the lost profits sought contemplated an extension of the business to provide "virtual" office spaces. Maestri provided the only testimony about the prospect of TRI-MSF offering these services in the future. He explained that virtual offices were set up so an individual would pay a fee per month, entitling that person to have a listing in a phone book, a mailing address, and a receptionist. He stated these offices could be a very profitable part of an executive suite business. When asked to the best of his knowledge if virtual offices were part of TRI-MSF's executive suite business, he replied, "Because I started doing these in Baton Rouge, I called Ted and said, `Ted, I'm doing these in Baton Rouge. You need to think about these in Florida,' and I was going through that office and preparing to do that."
With respect to the tortious interference with business relationships claim, Baturin testified he was never able to entertain firm offers to buy the business because Florida Sunrise "scared all of the buyers away." Baturin said there was a $120,000 offer to buy the business, which they did not accept because their target price was $300,000.
Florida Sunrise argues that the lost profit damages cannot be sustained regardless of how the jury arrived at the ultimate amount. Under the facts of this case, we agree.
First, Florida Sunrise's contention that depreciation should have been deducted in determining net profits is correct. See Orlando Orange Groves Co. v. Hale, 119 Fla. 159, 161 So. 284, 292 (1935) (citation omitted) (finding "net profits, generally speaking, implies what remains in the conduct of a business after deducting from its total receipts the expenses incurred in carrying on the business and that to such expenses may be charged . . . depreciation"); Southern Bell Tel. & Tel. Co. v. Kaminester, 400 So.2d 804, 807 (Fla. 3d DCA 1981) (stating that depreciation would have to be considered in computing net profits).
*424 Second, the evidence as to virtual offices being provided was simply too speculative, and any amount awarded for this prospective extension of the business should not have been included in the determination of lost profits.
Although it has been recognized that business can recover prospective profits notwithstanding a lack of "track record," the party must prove (1) causation and (2) a "standard by which the amount of damages may be adequately determined." Halliburton Co. v. Eastern Cement Corp., 672 So.2d 844, 846 (Fla. 4th DCA 1996) (quoting W.W. Gay Mech. Contractor, Inc. v. Wharfside Two Ltd., 545 So.2d 1348 (Fla.1989)).
In Halliburton, we found lost profits too speculative where they "would purportedly have resulted from the operation of 4 additional systems, which the buyer says it would have purchased sometime in the future if the one system sold under the contract in suit had performed as warranted." Id. at 847 (emphasis in original). We reasoned, "[a]ll that was offered was a hope of commercial fortune hanging from a thin thread of `what-ifs'buoyed by the buyer's after-the-fact testimonial conviction that success and profits would surely have been there for the taking." Id.
In North Dade Community Development Corp. v. Dinner's Place, 827 So.2d 352, 353 (Fla. 3d DCA 2002), the court found lost profits too speculative when "the one page of projected earnings in the prospectus was little more than an unsupported wish list of what the lessee hoped would occur in the coming years." The court found this evidence insufficient "to satisfy the mind of a prudent, impartial person as to the amount of profits lost as a result of the lessor's breach." Id. (citations omitted).
Here, Maestri merely testified that he had suggested to Baturin that the executive suite business expand into providing virtual office space, a venture only Maestri claimed would have been profitable for TRI-MSF. We can discern no sound basis to distinguish this from the hope of commercial fortune which was insufficient to sustain a lost profit award in Halliburton. Further, as the court reasoned in Dinner's Place, Maestri's testimony here equates to "an unsupported wish list" of what TRI-MSF may have hoped to occur in the remaining years of the lease.
Similarly, we find Baturin's testimony about potential buyers being scared away by Florida Sunrise too speculative, so that no damages should have been awarded for that aspect of the tortious interference claim. As to Florida Sunrise taking over the business and offering new leases, those damages, to the extent authorized for tortious interference, are properly subsumed in the conversion lost profit damages.
We also agree that some amount for officer compensation should be deducted in the net profit calculation. See Innkeepers Int'l, Inc. v. McCoy Motels, Ltd., 324 So.2d 676 (Fla. 4th DCA 1975) (holding expenses of labor are to be taken into consideration in establishing lost profits); Sostchin v. Doll Enter., Inc., 847 So.2d 1123 (Fla. 3d DCA 2003) (citation omitted) (stating, "In proving damages caused by lost net profits, a corporation, in arriving at the net loss, must deduct the expense of salaries paid to its officers . . ."); Kaminester, 400 So.2d at 804 (holding same). In the case at bar, the record is consistent that $10,000 was a sufficient amount to be deducted from net profits, where Baturin testified that the executive suites business was run without the benefit of a full-time property manager.
Consequently, we find a portion of the $735,000 award is sustainable. The tax *425 returns, including depreciation, provide concrete evidence as to the lost profit average for the remaining renewable ten years on the lease, less a deduction of $10,000 per year for officer compensation.[3] In addition, the jury could have properly included conversion damages in its award based on Maestri's testimony. The remaining portion of the damage award, however, is not sustainable, as it could only have been based on the speculation regarding virtual office space and Baturin's speculative testimony regarding offers to buy the business.
Therefore, we reverse and remand this case for remittitur. As we realize the verdict form in this case leaves the specific damage award for each cause of action indeterminable, we remand for the trial court to determine an appropriate remittitur based on the highest damage award sustainable from the evidence presented at trial, consistent with this opinion. In the event the trial court is unable to determine an appropriate amount for remittitur, or TRI-MSF declines to accept the remittitur, we remand for a new trial. See Tobias v. Osorio, 681 So.2d 905 (Fla. 4th DCA 1996); Sutter v. Hammond, 545 So.2d 497 (Fla. 4th DCA 1989).
We also note that the final judgment states that it is against Florida Sunrise and its assigns. The judgment should not have included the language and its assigns. Accordingly, we direct that the trial court not include this language in any subsequent judgment.
As to all other issues raised, we find no reversible error or abuse of discretion.
STEVENSON, C.J., concurs.
POLEN, J., concurs in part and dissents in part with opinion.
POLEN, J., concurring in part and dissenting in part.
I agree with the majority opinion in all respects except for the reversal of damages pertaining to appellees' claim for tortious interference with their attempts to sell the business. As to that claim, I would hold there was sufficient competent, substantial evidence to make this a jury question, and affirm.
NOTES
[1] for Florida Sunrise
[2] Though not addressed by the parties, our examination of this tax return indicates that the net profit for that year was $54,759 and, therefore, it is unclear how Patella arrived at the $63,303 figure.
[3] We do not rely on Baturin's calculation because it failed to account for depreciation, nor do we rely on Patella's calculation because it was based on an inflated officer compensation amount.